IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

ALBERTO RUIZ, (R46712)

        Petitioner,

    v.

MARK WILLIAMS, Day-to-Day Warden,
Hill Correctional Center,

        Respondent.

No. 19 CV 757

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Alberto Ruiz brings a habeas corpus petition challenging his murder conviction from the Circuit Court of Cook County. *See* 28 U.S.C. § 2254. His federal petition, filed in 2019 after his state-court criminal case concluded in 2008, is untimely unless his actual innocence excuses it from the ordinary statute of limitations. The actual-innocence exception is a narrow and demanding one, and Ruiz has not marshaled enough evidence to satisfy the exception. The petition is therefore dismissed as untimely.

## I. Background

### A. The Trial

On April 18, 2003, someone shot petitioner Alberto Ruiz in the 3000 block of South Springfield Avenue in Chicago's Little Village neighborhood. *People v. Ruiz,*

No. 1-05-3246 (Ill. App. Ct.); [7-9] at 5.[1] Ruiz was a member of the Two-Six street gang, and was shot in Two-Six territory. *Id*. Ruiz survived. *See id*.

Nine days later on April 27, Jose Acosta was shot and killed near his home on the 3000 block of South Drake Avenue, also in Little Village. *Id*. at 1. Acosta was a member of the Latin Kings, a rival of the Two-Six gang, and he was murdered in Latin Kings' territory. *Id*. at 1, 5. The two gangs were "at war" at the time. *Id*. at 2.

There were three eyewitnesses to Acosta's murder: Blanca Martinez, Acosta's girlfriend; Christian Aguilera, a Latin King member; and Jose Aguilera, Christian's brother. *Id*. at 1–4.

At approximately 9:20 p.m. on April 27, Acosta, Martinez, and the Aguilera brothers were standing by a car outside of Acosta's home. *Id*. at 2. Acosta and Jose Aguilera left the group to use a payphone, while the others remained at the car. *Id*. at 2–3. Martinez heard one or two gunshots and saw Ruiz pointing a gun at the victim. *Id*. at 4. She also heard Jose Aguilera screaming, "Folks, Folks, they got Snoopy." *Id*. at 4. Martinez explained that "Folks" referred to the rival Two-Six gang, and Jose Aguilera testified that Snoopy was Acosta's nickname. *Id*. at 2, 4. Martinez initially did not tell the police what she witnessed that evening because her family lived on the same block as Ruiz. *Id*. at 4. Martinez cooperated with the police after

---

[1] Bracketed numbers refer to entries on the district court docket and cited page numbers are taken from the CM/ECF header placed at the top of filings. *See also Coleman v. Hardy*, 628 F.3d 314, 320 (7th Cir. 2010) (citing 28 U.S.C. § 2254(e)(1); *Araujo v. Chandler*, 435 F.3d 678, 682 (7th Cir. 2005)) (state court factual findings are accorded a presumption of correctness when evaluating prisoner's actual-innocence argument).

her family moved in January 2004. *Id.* She identified Ruiz from a photo array and in court as the person she saw pointing a gun at Acosta. *Id.*

Christian Aguilera was standing by the car talking to Martinez when Acosta and Jose Aguilera walked to the pay phone. *Id.* at 2–3. He heard two gunshots and ran toward the shooting. *Id.* at 3. He saw four sparks coming from a gangway. *Id.* He was approximately three houses away from a hooded shooter he recognized as Ruiz. *Id.* Christian Aguilera knew Ruiz as "Little Maton," and the two had previously fought at a parade. *Id.* He identified Ruiz as one of the shooters during his in-court testimony. *Id.*

Christian Aguilera initially told the police that he heard the gunshots, but denied witnessing the shooting because fellow gang members told him to say nothing. *Id.* at 3. In November 2003, he cooperated with the police after his arrest on an unrelated case, but did not receive a promise of leniency for his cooperation. *Id.* at 3, 5–6. Christian Aguilera identified Osmar Alejo (Ruiz's eventual codefendant) in a photo array as one of the shooters. *Id.* at 1, 6. This led to the arrest of both Alejo and Ruiz. *Id.* at 6. Christian Aguilera identified Ruiz in a lineup and in court as one of Acosta's shooters. *Id.* at 3, 6.

According to Jose Aguilera, as he and Acosta walked toward the corner store, two people in dark hooded sweatshirts approached and spoke to Acosta briefly. *Id.* at 1. They pulled out guns and started shooting. *Id.* Jose Aguilera ducked behind a car and saw the shooters run down a gangway. *Id.* at 1–2. The police showed him a series

of photographs on the evening of the murder, but he did not make a positive identification. *Id*. at 2. He also did not make an identification when viewing a lineup the next day. *Id*. Several months later, he identified Alejo in both a photo array and lineup as one of the shooters, but did not identify the second shooter. *Id*. Jose Aguilera initially told the police that only one of the two offenders had a gun, but at trial testified that both assailants had guns. *Id*.

Chicago Police Detective James Egan was assigned to investigate the shootings of both Ruiz and Acosta. *Id*. at 5. He spoke to Ruiz at the hospital following his shooting, and days later—after Acosta's murder—Egan spoke to Jose Aguilera, Aguilera's mother, and Martinez. *Id*. After the eyewitnesses began cooperating in the Acosta murder, Ruiz was taken into police custody. *Id*. at 6.

Detective Egan conducted four interviews of Ruiz while he was in custody. *Id*. In the first interview, Ruiz denied being at the scene of the Acosta shooting, but he had heard that fellow gang members "Cholo" and "Ghost" were the shooters. *Id*. Egan showed Ruiz pictures of individuals with those nicknames, but Ruiz failed to make an identification. *Id*. In a second interview with Egan, Ruiz said that he was at home during the shooting. *Id*.

Ruiz's story changed during his third interview. *Id*. He said Alejo and Ghost came to his house in a Chevy Suburban and told him to "come with us, we're going to get a King because you got shot last week." *Id*. Ruiz said he rode with Alejo and Ghost as they drove into Latin Kings territory armed with handguns. *Id*. They pulled into

4

an alley, and Ruiz said he stayed in the car while Alejo and Ghost got out and ran down the gangway. *Id*. at 6–7. Ruiz said he heard several gunshots, Alejo and Ghost returned, and the group drove off. *Id*. at 7. In his fourth and final interview, Ruiz said, "I'm not getting myself in trouble. I was home that night, I was home with Osmar [Alejo]." *Id*.

Ruiz's mother testified at trial and offered him an alibi. *Id*. She explained that she took him to Mt. Sinai hospital for treatment of his neck pain at 1:00 a.m. on the morning of the murder, April 27, 2003. *Id*. They returned home from the hospital at 3:00 a.m.[2] *Id*. According to Ruiz's mother, he did not leave their home the remainder of the day. *Id*. A few of her friends from church visited her and her son in "the early evening hours." [7-5] at 107. Ruiz's shooting injury was limited to his right arm and neck. *Id*. at 113. On the night of the murder, Ruiz was able to move his left arm, and could walk without assistance. *Id*. at 112–13.

Ruiz was charged with first-degree murder and unlawful use of a weapon by a felon. [7-6] at 155. The prosecution alleged that Ruiz personally discharged the firearm during the commission of the murder. *Id*. The jury was also instructed on an accountability theory. *Id*. at 166. The jury found Ruiz guilty of first-degree murder, but that he did not personally discharge a firearm during the commission of the

---

[2] At trial, the parties stipulated that Ruiz was admitted to the Mt. Sinai Hospital emergency room at 1:00 a.m. and discharged at 3:01 a.m. on April 27, 2003. [7-5] at 116.

murder. [7-9] at 8. The jury also found Petitioner not guilty of unlawful use of a firearm. *Id*. He was sentenced to 28 years of imprisonment. *Id*. at 1.

## B. Direct Appeal and Postconviction Proceedings

Ruiz appealed his conviction to the Appellate Court of Illinois. *See* [7-7]. The court affirmed, [7-9] at 14, and Illinois Supreme Court denied Ruiz's petition for leave to appeal. *People v. Ruiz*, No. 105192, 879 N.E.2d 937 (Ill. Nov. 29, 2007) (Table). Ruiz did not file a petition for a writ of certiorari before the United States Supreme Court. [38] at 3.

On May 28, 2008, Ruiz filed a postconviction petition pursuant to Illinois's Post Conviction Hearing Act, 725 ILCS 5/122-1. [45-5] at 211. The petition alleged ineffective assistance of trial counsel for failing to investigate and call alibi witnesses. *People v. Ruiz*, No. 1-15-2022 (Ill. App. Ct. May 18, 2018); [7-17] at 6. Ruiz moved to voluntarily dismiss the petition, and the trial court granted that motion on September 2, 2008. [45-5] at 234–37. In 2010, Ruiz filed a motion for transcripts before the state court, but the request was denied. [7-17] at 6; [45-5] at 238–47.

In December 2014, Ruiz filed a successive state-court postconviction petition arguing that he was innocent and provided affidavits from friends, family members, and neighbors who, in sum, placed him at his mother's home at the time of the murder. [7-17] at 7; [45-5] at 258–95. The state trial court rejected Ruiz's request to file his successive petition. [7-17] at 14. The court found the affidavits unreliable and insufficient. *Id*. The trial court noted that Ruiz's mother had not mentioned any of

6

these witnesses when she testified at trial, there was no attempt by the defense to bring these witnesses to trial, and there was no explanation for why it took more than a decade for Ruiz to present the witnesses. *Id*. The state appellate court affirmed the trial court's decision, *id*. at 21, and the Illinois Supreme Court denied Ruiz's petition for leave to appeal. *People v. Ruiz*, No. 123799, 108 N.E.3d 841 (Ill. Sept. 26, 2018) (Table).

In February 2019, Ruiz brought a federal habeas corpus petition challenging his conviction in the United States District Court for the Central District of Illinois. *Ruiz v. Dorethy*, No. 4:19-cv-4022-CSB (C.D. Ill.). The case was dismissed for nonpayment of the filing fee. That dismissal did not count towards the limitations on second and successive habeas corpus petitions. 28 U.S.C. § 2244(b); *Altman v. Benik*, 337 F.3d 764, 776 (7th Cir. 2003) (per curiam) (citing *Benton v. Washington*, 106 F.3d 162, 165 (7th Cir. 1996)).

Ruiz next brought the pending habeas corpus case in this court. [1]. This court noted that the petition appeared untimely on its face, 28 U.S.C. § 2244(d), but recognized that actual innocence can excuse an otherwise untimely petition. *McQuiggin v. Perkins*, 569 U.S. 383 (2013); [4] at 2. This court also recognized that Ruiz was alleging a claim under *Miranda v. Arizona*, 384 U.S. 436 (1966), arising from Detective Egan's interrogation of him. [4] at 3. The court ordered briefing on whether Ruiz could use actual innocence to excuse his untimely petition. [4].

7

While the parties were briefing the actual-innocence issue, Ruiz asked to stay these proceedings so that he could proceed with an additional successive postconviction petition in the state court. [11]. The court granted the request. [12].[3]

In June 2019, Ruiz returned to state court and sought permission to bring a second successive postconviction petition. [45-5] at 366–448. Like the other successive petition, Ruiz provided affidavits from family members, friends, and neighbors to support his claim that he was home at the time of the murder. *People v. Ruiz*, No. 1-19-1701 (Ill. App. Ct. May 27, 2021); [45-1] at 4. He also added two new points to support his innocence claim. First, he alleged *Miranda* violations during his interrogation by the detectives in his case, Egan and Edward Carroll. [45-1] at 4. He provided documents from two civil rights cases in the Northern District of Illinois involving the detectives. *Id*. at 3. Next, Ruiz provided medical records from his own shooting. *Id*. at 4. The records, according to Ruiz, demonstrated that he suffered a very serious neck injury, and his health was so poor that he was physically unable to participate in the murder. *Id*.

The state trial court denied the request to bring the successive petition, and the appellate court granted Ruiz's attorney's motion to withdraw from the appeal pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *Id*. at 4–6. The Supreme

---

[3] The Illinois Constitution recognizes a freestanding claim of actual innocence that is cognizable in a state-court postconviction proceeding. *See* [7-17] at 17; *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Whether a freestanding actual-innocence claim exists under federal law has not been resolved. *See McQuiggin v. Perkins*, 569 U.S. 383, 384 (2013); *see also Cal v. Garnett*, 991 F.3d 843, 850–51 (7th Cir. 2021). So it made sense for Ruiz to keep trying at a state-court remedy.

Court of Illinois denied a petition for leave to appeal. *People v. Ruiz*, No. 127393, 175 N.E.3d 105 (Ill. Sept. 29, 2021) (Table).

Ruiz then returned to this court, and the stay was lifted. [37]. He now brings an amended habeas corpus petition raising his actual-innocence argument: new witnesses say he was home at the time of the shooting, police misconduct explains his confession, and his medical records show that he was physically incapable to committing the murder.[4]

### C.    Petitioner's Evidence of Actual Innocence

####    1.    Witness Affidavits[5]

Arturo Ponce's March 2012 affidavit explains that he had recently run into Ruiz's mother and asked about her son. [38-1] at 1. According to Ponce, he and two other men, Francisco Almendarez and Cuauhtemoc Guevara, were standing across the street from Ruiz's house on the Sunday of the week that Ruiz had come home from the hospital after being shot. *Id*. At approximately 8:00 p.m., Ponce saw people with bibles going into Ruiz's house. *Id*. The "bible people" left about two hours later. *Id*. at 1–2. (The murder occurred around 9:20 p.m. on Sunday, April 27, 2003. [7-9] at 1–3.) After the "bible people" left, Ponce's group then crossed the street to visit Ruiz.

---

[4] Ruiz seems to be raising a freestanding actual-innocence constitutional claim and also using actual innocence to excuse the untimeliness of the petition. He also renews the *Miranda* claim regarding his police interrogation. Because the threshold timeliness issue resolves the case, the court does not reach the merits.

[5] Some of Ruiz's affidavits are in Spanish and are accompanied by a translated English version. *E.g.* [38] at 70–73. Respondent does not contest the validity of the English translations.

*Id*. at 2. Ponce explained that Ruiz's mother let his group into her home; Ruiz was in his bed in pain, and he was unable to get up. *Id*. at 2–3. Ponce said his group left the home and then hung out on the block until midnight. *Id*. at 3.

Almendarez's March 2012 affidavit tracked Ponce's version of events. [38-1] at 4–6. Ponce had contacted him. *Id*. at 4. Almendarez explained that he had a poor memory due to prior drug use, but he did recall some things. *Id*. at 4–5. He remembered waiting outside Ruiz's home for a long time while others went into the home, and Ponce's group was not able to see Ruiz until 10:00 p.m. *Id*. at 5. Almendarez did not recall the exact date, but it was the first Sunday evening after Ruiz's return from the hospital. *Id*. Almendarez is recently deceased. [38] at 10.

Guevara's March 2012 affidavit is consistent with Ponce's and Almendarez's. Guevara said that Ponce had recently reached out about his recollection of the evening. [38] at 68. Guevara remembered going to visit Ruiz on the Sunday after he returned home from the hospital, and needing to wait a long time for some "church people with bibles" to leave Ruiz's home. *Id*. He remembered his group getting inside Ruiz's house around 10:00 p.m., and being able to speak to Ruiz for a few minutes. *Id*. Ruiz was "drugged up, and dozing off" with slurring speech because he had just taken medicine. *Id*. at 69. The men left and then loitered across the street until approximately midnight. *Id*.

Three neighbors—Martha Contreras, Vannessa Quintanilla, and Adilene Espinoza—also placed Ruiz at home during the time of the murder. Contreras was

an upstairs neighbor living in the same building as Ruiz and his mother. [38] at 54. She explained in her 2012 affidavit that Ruiz's mother contacted her about the case. *Id*. Contreras told Ruiz's mother that she didn't want to get involved because Ruiz was a "known gangbanger in that neighborhood." *Id*. Contreras recalled coming to Ruiz and his mother's apartment at 9:00 p.m. on April 27, 2003. *Id*. She saw "church people" praying and visiting Ruiz in the apartment. *Id*. She talked to Ruiz's mother and stayed until approximately 10:00 p.m. *Id*. The "church people" left approximately 15 minutes later. *Id*. Contreras attests that Ruiz was in the apartment for the entire time she was present. *Id*.

Vannessa Quintanilla's April 2012 affidavit said that she recently found out that Ruiz was looking for anyone who saw the "church people" at his house in April 2003. [38] at 66. She was "100% positive" that on April 27, 2003, she saw a group of people with books that looked like bibles go inside Ruiz's house between 7:30 p.m. and 8:00 p.m. *Id*. at 65. The "church people" left around 9:30 or 9:45 p.m. *Id*. She went to Ruiz's home and visited him in his room. *Id*. Quintanilla said she saw Ruiz was in pain. *Id*. She said she returned to her parents' home before her 10:00 p.m. curfew. *Id*.

In her affidavit, Adilene Espinoza said that she also recently heard that Ruiz was looking for her. [38] at 70. She rented a room in Ruiz's apartment and saw him at home on April 27, 2003. *Id*. She saw him around 8:00 p.m. resting in his bedroom. *Id*. Espinoza recalled the "church people" coming to visit. *Id*. The church visitors left around 9:45 p.m. that evening. *Id*.

11

Finally, Ruiz's mother and his aunt provided affidavits. The mother's 2012 affidavit is consistent with her trial testimony that her son was home praying with the "church people" at the time of the murder. [38] at 58. She noted in her affidavit that she suffers from mild Alzheimer's, takes medication for the condition, and "suffer[s] from a forgetful memory at times."[6] *Id.*

The aunt's 2011 affidavit stated that she frequently visited Ruiz in April 2003. *Id.* at 62. She explained that Ruiz was unable to feed and bathe himself and needed assistance to get out of bed to use the bathroom. *Id.* According to his aunt, Ruiz "totally depend[ed]" on his mother during that period, and was in extreme pain on April 27, 2003. *Id.*

### 2. Police Misconduct

Petitioner alleges that Detectives Egan and Carroll have an established history of coercing and fabricating confessions from suspects, citing *Hughes v. Krause*, No. 06 C 5792 (N.D. Ill), and *Hunt v. Roth*, No. 11 C 4697 (N.D. Ill.). The *Hughes* case alleged that a 15-year-old mentally disabled boy was wrongfully arrested for assaulting a woman. *Hughes v. Krause*, No. 06 C 5792, 2008 WL 904898, at *1 (N.D. Ill. Mar. 31, 2008). The lawsuit alleged that a group of Chicago police detectives, including Egan and Carroll, along with a Cook County Assistant State's Attorney, used improper and

---

[6] The mother's trial testimony from 2005, makes no mention of Alzheimer's, memory issues, or taking medication. [7-5] at 104–16. The record does not explain when her memory issues began.

coercive interrogation tactics including physical abuse to obtain a fabricated confession from Hughes, but DNA evidence later exonerated him. *Id.*

A review of the docket in *Hughes* shows that Carroll was voluntarily dropped as a defendant, and the claims against Egan were dismissed pursuant to a settlement. No. 06 C 5792, Dkt. Nos. 104, 133–35. The case did not go to trial, and there was no finding of liability against Egan, Carroll, or any other defendant.

In *Hunt*, the plaintiff was arrested for aggravated battery to a police officer and resisting/obstructing a police officer. *Hunt v. Roth*, No. 11 C 4697, 2013 WL 708116, at *2 (N.D. Ill. Feb. 22, 2013). He was acquitted of the aggravated battery charge. *Id.* Egan was named as a defendant in the civil-rights suit, but it appears that Carroll was not involved in this case. *Id.* at *1. Egan was not involved in the original arrest and there was no confession in *Hunt*. *Id.* at *2. Instead, Egan's role was allegedly to discuss the events with the arresting officers and, in turn, relate the information to the assistant state's attorney. *Id.* The claims against Egan involved false arrest, First Amendment retaliation, and malicious prosecution. *Id.* at *5–8. Egan was granted summary judgment on all claims except for the false-arrest claim. *Id.* at *5, *9. The case was subsequently dismissed pursuant to a settlement reached by the parties. No. 11 C 4697, Dkt. No. 110. The case did not go to trial and there was no finding of liability against Egan or any other defendant.

3.    Petitioner's Medical Records

Ruiz was shot in the right side of his neck below the mastoid, nine days before the Acosta shooting. [38-1] at 27. The bullet injured two spinal vertebrae in his neck. *Id*. He was hospitalized at Mt. Sinai hospital from April 18 through 23, 2003. *Id*. At discharge, he had strength throughout his body with decreased movement in his right upper extremity with slight movement of the right thumb. *Id*. Although Ruiz had suffered from decreased sensation and strength in his right arm during his hospitalization, his condition improved sufficiently to allow discharge to his home followed by outpatient care. *Id*. at 28. He received Vicodin and Colace at discharge, but no additional remedial assistance was ordered. *Id*. The medical staff was aware that Ruiz lived in a second-floor apartment and had to go up twenty steps with handrails to get to his home. *Id*. at 24.

He was seen at outpatient physical therapy on May 5, 2003, eight days after the murder. *Id*. at 32. According to the medical records, Ruiz reported that he was independent and able to perform all activities at that time. *Id*. Regarding his injured arm, he reported he could only wiggle his thumb while in the hospital, but he was able to move his wrist and fingers more over the two-week intervening period. *Id*. He also reported pain and the inability to perform activities of daily living with his right arm. *Id*. Ruiz was seen for physical therapy several times that summer and by August he was able to do four pushups. *Id*. at 41.

14

## II.   Analysis

The applicable one-year limitations period starts on the latest date of the: (A) completion of direct appeal (or expiration of time to bring the direct appeal), (B) removal of an unconstitutional state-created impediment that had previously prevented the filing of the petition; (C) recognition of a new constitutional right that has been made retroactive on collateral review by the Supreme Court of the United States; or, (D) date on which the factual predicate of the claim could have been discovered through due diligence. 28 U.S.C. § 2244(d)(1)(A)–(D). The one-year period is tolled when a petitioner's properly filed application for postconviction or other collateral relief is pending in the state courts. 28 U.S.C. § 2244(d)(2).

The relevant date for calculating the one-year period in this case is under § 2244(d)(1)(A). The last event in Ruiz's direct appeal was the denial of his petition for leave to appeal by the Supreme Court of Illinois. *People v. Ruiz*, No. 105192, 879 N.E.2d 937 (Ill. Nov. 29, 2007) (Table). Petitioner's direct appeal was complete 90 days following that denial, when the time to bring a certiorari petition to the United States Supreme Court expired. *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). The date the one-year limitations period started is February 27, 2008.

Ninety-one days ran against the statute of limitations period until Ruiz filed his first state postconviction petition on May 28, 2008. [45-5] at 211. That proceeding tolled the limitations period pursuant to 28 U.S.C. § 2244(d)(2), until Ruiz voluntarily dismissed the petition on September 2, 2008. [45-5] at 234–38. The one-year

limitation period expired 274 days later on June 3, 2009. Petitioner did not file a habeas corpus petition or any additional state court proceedings before June 3, 2009. Ruiz filed this federal habeas corpus case well after the expiration of the statute of limitations.[7]

Actual innocence can excuse an otherwise untimely federal habeas corpus petition, but this is a "demanding and seldom met" standard. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citing *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

The burden is on Ruiz to show that "'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016) (quoting *House*, 547 U.S. at 538). An actual-innocence claim "must be both credible and founded on new evidence." *Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018) (citing *Schlup*, 513 U.S. at 324). This must be "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

---

[7] Ruiz's state-court proceedings filed after the expiration of the federal statute of limitations are irrelevant. *See Dolis v. Chambers*, 454 F.3d 721, 723 (7th Cir. 2006) ("The state court's willingness to entertain a belated collateral attack on the merits does not affect the timeliness of the federal proceeding.") (internal quotation marks and citations omitted). Moreover, those proceedings were of the type that do not toll the statute of limitations. *See Martinez v. Jones*, 556 F.3d 637, 639 (7th Cir. 2009) (per curiam) (Illinois court's denial of prisoner's request to bring a successive postconviction petition results in that proceeding not tolling under § 2244(d)(2)); *Patterson v. Harrington*, No. 13 C 7324, 2014 WL 4479937, at *3 (N.D. Ill. Sept. 11, 2014) (motion for transcripts does not toll under § 2244(d)(2)).

evidence.'" *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) (quoting *Schlup*, 513 U.S. at 324). The evidence must be "new in the sense that it was not before the trier of fact." *Arnold*, 901 F.3d at 836–37 (citing *Schlup*, 513 U.S. at 324; *Gladney*, 799 F.3d at 896, 898).

The court's "function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Blackmon*, 823 F.3d at 1101 (citing *House*, 547 U.S. at 538; *Schlup*, 513 U.S. at 329) (internal quotation marks omitted). The court "considers the total record—all the evidence, old and new, incriminatory and exculpatory—and makes a probabilistic determination about what reasonable, properly instructed jurors would do." *Gladney*, 799 F.3d at 896 (quoting *House*, 547 U.S. at 538; *Schlup*, 513 U.S. at 327–28).

Ruiz's medical records do not exonerate him. To the contrary, the records suggest that he was physically capable of committing the murder. Although his spine was injured from his shooting and he had decreased strength and sensation in his right arm and hand, the injury was limited to that area and did not extend to his left arm and hand, torso, or legs. [38-1] at 27. The medical records are consistent with Ruiz's mother's trial testimony—he was able to use his left arm and walk without assistance at the time of the murder. [7-5] at 107. The records demonstrate that Ruiz was sufficiently mobile to be discharged from the hospital and return home a few days before the Acosta shooting, visit the emergency room and return home on the morning

17

of the murder, and participate in an outpatient physical therapy appointment a few days after the murder. A juror would not take this medical evidence as casting a reasonable doubt on his ability to ride in a car with his fellow gang members while they carried out the murder on his behalf (as Ruiz stated to the police). The medical records are consistent with the jury's apparent verdict of guilt based on accomplice liability, and they do not undermine the prosecution's other theory—that Ruiz discharged a firearm—because they show that Ruiz could walk and use his left arm, and had weakness (but not total paralysis) in his right arm and hand.

Ruiz has Guevara's affidavit to suggest that he seemed drugged up that night, but the alleged limitation was not due to a physical injury but instead due to medication. [38] at 68. Ruiz's aunt's affidavit is the only evidence in the record suggesting that he was physically incapacitated at the time of the murder. *Id.* at 62. She explained that Ruiz was unable to feed and bathe himself and needed assistance to get out of bed to use the bathroom. *Id.* According to his aunt, Ruiz "totally depend[ed]" on his mother during that period. *Id.*

The evidence from Ruiz's friend and aunt falls short of what is necessary under the demanding actual-innocence standard. The affidavits are more than eight years after the shooting. *See McQuiggin*, 569 U.S. at 399 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."); *Blackmon*, 823 F.3d at 1102 ("Furthermore, they did not come forward until eight years after the murder, a substantial delay that could affect their

18

memories and/or their credibility."). The friend, Guevara, said he would have been willing to testify at trial, but no one asked him. [38] at 69. He guessed that he might have been difficult to find because he moved around a lot. *Id.* But that explanation is weak and just a guess on Guevara's part. Ruiz's aunt does not explain why there was a delay in presenting her testimony. *See* [38] at 62. Neither the friend nor the aunt suggests any fear of gang retaliation as the reason their information was delayed. Moreover, even if the court ignored the delay in providing the affidavits, a "balance between inculpatory and exculpatory witnesses is not enough to meet the demanding *Schlup* standard for actual innocence." *Blackmon*, 823 F.3d at 1102; *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (citing *Schlup*, 513 U.S. at 324) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."). In sum, the medical evidence, even when paired with the witness affidavits, does not cast a reasonable doubt on the theory that Ruiz was physically capable of committing, or participating in, the murder.

Ruiz also argues that the lawsuits from other cases against the detectives in his case demonstrate misconduct regarding his confession. Ruiz's statement to Evans that he accompanied Alejo to retaliate against a Latin King supports the accountability theory on which the jury seems to have convicted; therefore, the

19

confession must have been central to the absence of reasonable doubt, so the argument goes. But rather than establishing Ruiz's innocence, the allegations of misconduct tend only to impeach the detectives' credibility. "And latter-day impeachment evidence 'seldom, if ever, make[s] a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account....'" *McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 334 (1992)).

And even as mere impeachment, the evidence Ruiz provides is weak. Only one of the two lawsuits involves an alleged improper confession, and neither case resulted in a finding of responsibility against either officer. At bottom, the only evidence attacking Ruiz's confession is his allegation that the confession is improper, but that does not meet the demanding actual-innocence standard. *See McDowell*, 737 F.3d at 484 (a petitioner's own version of events is insufficient to excuse procedural default).

Finally, Ruiz provides the affidavits of his family, friends, and neighbors that state that he was home at the time of the shooting. Although exculpatory, these affidavits do not make it more likely than not that no reasonable jury would have convicted Ruiz. Some of the witnesses may have reasonably feared retaliation at the time of the trial, but the length of delay weakens the value of their testimony. These witnesses came forward many years after the murder, some say they saw Petitioner at 10:00 p.m. but that was after the 9:20 p.m. shooting, some claim remembering events of the evening despite acknowledging memory loss, and some remember

pedestrian details of the evening with detail that one would expect to be forgotten over the passage of many years. *Blackmon*, 823 F.3d at 1102; *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009).

Even if the jury moved beyond those difficulties with these new witnesses, the trial testimony from the two eyewitnesses who identified Ruiz as a shooter as well as Ruiz's admissions to the police remain strong evidence of guilt. Although Ruiz's alibi witnesses now outnumber the eyewitnesses, the case still presents, at most, as a contest between inculpatory and exculpatory witnesses. That is insufficient to meet the actual-innocence standard. *See Blackmon*, 823 F.3d at 1102; *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010); *Hayes*, 403 F.3d at 937.

The evidence must be considered as a whole. Here, a case with two eyewitnesses and a post-arrest inculpatory statement (perhaps impeached by a suggestion of misconduct by the detectives), medical records that do not exonerate the accused, and several alibi witnesses who only came forward many years later would be a triable case for the defense. But it would not be one where no reasonable jury could convict; it would remain one where a jury could reasonably credit the post-arrest statement and reject the weak alibi. Ruiz has not demonstrated actual innocence to excuse the untimeliness of his federal petition.

## III.    Certificate of Appealability and Notice of Appeal Rights

The court declines to issue a certificate of appealability. The application of the actual-innocence gateway and Ruiz's inability to clear that hurdle is not reasonably

debatable, and Ruiz has not made a substantial showing of a denial of a constitutional right. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

This is a final decision ending this case in this court. Any notice of appeal must be filed with this court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). A petitioner need not bring a motion to reconsider this court's ruling to preserve his appellate rights. However, if Ruiz wants this court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed no later than 28 days after the entry of judgment. *See* Fed. R. Civ. P. 59(e). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a motion pursuant to Rule 59(e) or Rule 60(b) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 59(e) or Rule 60(b) motion filed no later than 28 days after entry of judgment suspends the deadline for filing an appeal until the motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv), (vi).

## IV. Conclusion

Petitioner's habeas corpus petition, [1] [36] [38], is denied as untimely. The court declines to issue a certificate of appealability. The Clerk shall: (1) terminate Respondent Brannon-Dortch, (2) add Mark Williams, Day-to-Day Warden, Hill

Correctional Center as Respondent; (3) alter the case caption to *Ruiz v. Williams*; and
(4) enter a Rule 58 judgment in favor of Respondent and against Petitioner.

ENTER:

Date:  July 27, 2022

Manish S. Shah
United States District Judge